1  BARRY J. PORTMAN
   Federal Public Defender
2  DANIEL P. BLANK
   Assistant Federal Public Defender
3  450 Golden Gate Avenue
   San Francisco, CA  94102
4  Telephone:  (415) 436-7700

5  Counsel for Defendant VELOZ-MANZO

8                IN THE UNITED STATES DISTRICT COURT

9                FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. CR 09-0240 MHP |
| | ) | |
| Plaintiff, | ) | DEFENDANT'S SENTENCING |
| | ) | MEMORANDUM |
| v. | ) | |
| | ) | Honorable Marilyn Hall Patel |
| HUMBERTO VELOZ-MANZO, | ) | February 22, 2010 |
| | ) | 9:00 a.m. |
| Defendant. | ) | |
| | ) | |

**INTRODUCTION**

Defendant Humberto Veloz-Manzo respectfully requests that the Court sentence him to 30 months imprisonment, due to a combination of factors under 18 U.S.C. § 3553(a), including extraordinary acceptance of responsibility and post-offense rehabilitation.

**BACKGROUND**

Humberto Veloz-Manzo was born on June 10, 1980, in Ecuandureo, Michoacan, Mexico. *See* Declaration of Daniel P. Blank in Support of Motion to Dismiss Indictment (Docket #15) (filed July 20, 2009) [hereinafter "Blank Decl."] ¶ 2. He is the fourth of five children born to Humberto Veloz Ramirez and Guadalupe Manzo Cerna, including two older sisters, Maria Elena and Maria Cristina; an older brother, Jaime; and a younger brother, Martin. *Id.* ¶ 3. At some time in 1989 or 1990, when Mr. Veloz-Manzo was about nine or 10 years old, he was brought into the United States and settled with his mother and brothers and sisters in Napa, California. *Id.* ¶ 4. Both of his parents had already been living in the United States for several years as Lawful Permanent Residents. *Id.* ¶ 5-6. On September 11, 1995, at the age of 15, Mr. Veloz-Manzo was also admitted to Lawful Permanent Resident status. *Id.* ¶ 7.

By the time Mr. Veloz-Manzo arrived in the United States, his parents were separated. *Id.* ¶ 9. His mother, who had been living in the United States since 1985, worked as a dishwasher at the Alexis Baking Company in Napa. *Id.* ¶ 5, 8. His father, Humberto Veloz, lived in Fort Worth, Texas. *Id.* ¶ 9. Mr. Veloz-Manzo was then raised by a single mother during his older childhood and teenage years. *Id.* ¶ 10. He attended public schools in the Napa Valley Unified School District, including Redwood Middle School, Napa High School, and Temescal High School, through the 11th grade. *Id.* ¶ 11.

The years 1998 and 1999 were something of a chaotic time for Mr. Veloz-Manzo and his family. Mr. Veloz-Cano had been sent for counseling as a youth, but he stopped attending when he turned 18 years old because the counselor did not have any knowledge of the gangs that were pervasive in Mr Veloz-Manzo's environment growing up. *See* PSR ¶ 41. On November 14,

DEFENDANT'S SENTENCING MEMO - 1 -

1998, when he was still just 18, Mr. Veloz-Manzo was the victim of gunshot wounds to the leg and shoulder in the course of an incident at an apartment complex in which six people were injured. Blank Decl. ¶ 12. Three days later, his younger brother Martin, then just 14 years old, was seriously wounded in an ambush drive-by shooting. *Id.* ¶ 13. Martin's gunshot wounds required prolonged treatment at the UCLA Medical Center, so the boys' mother relocated with Martin to a motel in Southern California for the next year, leaving Mr. Veloz-Manzo and his sisters on their own in Napa. *Id.* ¶ 14. Meanwhile, Mr. Veloz-Manzo's older brother, Jaime, had returned to Mexico to seek treatment for drug abuse. *Id.* ¶ 15. Mr. Veloz-Manzo's sister, Cristina, although only a few years older than him, raised him, because their mother was busy trying to earn a living. PSR ¶ 36.[1]

On November 2, 1999, Mr. Veloz-Manzo's 17-year-old girlfriend gave birth to a son, Jesus Humberto Veloz. *Id.* ¶ 16. By that time Mr. Veloz-Manzo, who had never graduated from high school, had found employment as a temp laborer in the wine industry. *Id.* ¶ 11, 17. He was working over 48 hours a week for the Mumm Winery through an assignment from the Alkar Temporary Service, earning $8.50 an hour. *Id.* ¶ 17.[2]

It was in the midst of these years that Mr. Veloz-Manzo suffered the conviction that would later form the basis of his removal proceedings. On June 16, 1999, Mr. Veloz-Manzo was convicted by guilty plea of a violation of California Penal Code § 245(a)(1), assault by means of force likely to produce great bodily injury, for which he was sentenced on January 5, 2000, to three years' imprisonment. *Id.* ¶ 18.[3] While in state custody, Mr. Veloz-Manzo was convicted

---

[1] Currently, Jaime, age 35, is in a "mental hospital" in Morelia; Cristina, age 33, is a special education assistant living in Napa, and Maria Elena, age 32, is a cafeteria worker at a high school, also residing in Napa. PSR ¶ 35.

[2] The fact of Mr. Veloz-Manzo's employment was corroborated by a 2000 Napa County Adult Probation report. PSR ¶ 45.

[3] Initially Mr. Veloz-Manzo had been placed on probation with a three-year suspended sentence. On November 30, 1999, he was convicted by guilty plea of a violation of California Penal Code § 12020(a), possession of a deadly weapon (specifically, a wooden fence picket and

DEFENDANT'S SENTENCING MEMO          - 2 -

1 in 2001 of a gang-related assault occurring on November 7, 2000. PSR ¶ 30.

2     Mr. Veloz-Manzo thereafter, at great risk to himself and his family, fully disassociated

3 himself from all gangs. PSR ¶ 37. Although Mr. Veloz-Manzo "grew up in a gang mentality,"

4 he completely broke with the gangs while in state custody during the early 2000s, and instead

5 began studying alone in his cell. *Id.* Among other things, Mr. Veloz-Manzo successfully

6 completed a course in anger management while in state custody. PSR ¶¶ 11, 41.

7     His criminal conduct behind him, Mr. Veloz-Manzo began striving to make a clean start.

8 He was married on April 24, 2005, to Lillia Herrera, a U.S. citizen who worked for Contra Costa

9 County and counseled juveniles about avoiding involvement in gangs. PSR ¶ 38; Blank Decl.

10 ¶ 19.[4] However, on September 17, 2008, the Department of Homeland Security charged Mr.

11 Veloz-Manzo as removable under the Immigration and Naturalization Act § 237(a)(2)(A)(iii), as

12 a non-United States citizen who was "convicted" "at any time after admission" of an "aggravated

13 felony," as defined in INA § 101(a)(43)(F), for a "crime of violence," as defined in 18 U.S.C.

14 § 16, with a sentence to a term of imprisonment of one year or more. Blank Decl. ¶ 22.

15     The Notice to Appear alleged, *inter alia*, that Mr. Veloz-Manzo was "on June 16, 1999,

16 convicted in the California Superior Court in the County of Napa for the offense of Assault with

17 a Deadly Weapon Likely to Produce Great Bodily Harm in violation of Section 245(a)(1) of the

18 Penal Code of California" [*sic*]. *Id.* ¶ 23 & Att. A. This allegation was factually incorrect. The

19 certified Abstract of Judgment from the California Superior Court, issued on January 5, 2000,

20 confirms that Mr. Veloz-Manzo's June 16, 1999, conviction was not for assault with a deadly

21 weapon, but for "assault by means of force likely to produce GBI [great bodily injury]." *Id.* ¶ 24

22 ─────────────

23 a metal chain). As a result of the new case his probation on the earlier section 245(a)(1) charge was revoked, and on January 5, 2000, Mr. Veloz-Manzo was sentenced on both of these cases.
24 The total sentence was four years: three years on the assault charge with two years concurrent on the weapon charge, plus one year on each charge for gang enhancements pursuant to California
25 Penal Code § 186.22(b)(1) with the gang enhancements to run concurrent.

26     [4] In what appears to be a typographically error, the PSR mistakenly states that they were married in 2004. PSR ¶ 38.

DEFENDANT'S SENTENCING MEMO     - 3 -

1  & Att. B. The Notice to Appear did not make any other factual allegations regarding any other
2  convictions or violations of law. *See id.* ¶ 23 & Att. A.[5]

3  Not just in the Notice to Appear, but throughout Mr. Veloz-Manzo's removal proceedings,
4  both the DHS and the Immigration Court repeatedly misdescribed his 1999 conviction.
5  Although Mr. Veloz-Manzo pleaded guilty in 1999 to assault by means of force, all of his
6  removal proceedings were conducted upon the misdescription of his 1999 conviction as having
7  been for assault with a deadly weapon. As noted above, the Notice to Appear erroneously
8  described the 1999 conviction as for "Assault with a Deadly Weapon Likely to Produce Great
9  Bodily Harm in violation of Section 245(a)(1) of the Penal Code of California . . . ." *Id.* ¶ 23 &
10 Att. B. Similarly, the Record of Deportable/Inadmissible Alien prepared on September 17, 2008,
11 erroneously states, "On June 16, 1999, Subject was convicted in the California Superior Court in
12 the County of Napa for the offense of Assault with a Deadly Weapon Likely to Produce Great
13 Bodily Harm . . . ." *Id.* ¶ 25 & Att. C. Indeed, this same inaccurate account of the 1999
14 conviction recurs throughout Mr. Veloz-Manzo's file. On October 1, 2008, Mr. Veloz-Manzo
15 was transferred to the Eloy Detention Facility at Eloy, Arizona. *Id.* ¶ 26. His Eloy intake form
16 lists, as "most severe current offense or detainer charge," a "6-16-99 Assault w/a deadly likely to
17 produce GBH, 3 yrs Prison." *Id.* ¶ 27 & Att. D.

---

[5] At the time he was charged as removable, Mr. Veloz-Manzo was incarcerated at Pleasant Valley State Prison in Coalinga, California, a minimum/medium security facility where he was serving a sentence for an unrelated 2001 state conviction. The 2001 conviction was never alleged by the government as a basis for his removal. Because the government alleged only the 1999 conviction in the Notice to Appear and throughout the subsequent proceedings, it is only that conviction that can be considered in evaluating his removal proceedings, because it was only if that conviction were in fact an aggravated felony that Mr. Veloz-Manzo could have been removed. *See Chowdhury v. INS*, 249 F.3d 970, 972 (9th Cir. 2001) (holding that convictions not alleged in the Notice to Appear cannot subsequently be asserted by the government as an independent basis for affirming an Immigration Court's removability decision).

DEFENDANT'S SENTENCING MEMO        - 4 -

On October 15, 2008, Mr. Veloz-Manzo appeared without counsel before the Immigration Court at Eloy, Arizona, and was ordered removed by Immigration Judge James DeVitto. *Id.* ¶ 28 & Att. E. At the removal hearing, Mr. Veloz-Manzo's 1999 conviction was again misdescribed as assault with a deadly weapon. *Id.* ¶ 29. Had the IJ been presented with proper documentation of Mr. Veloz-Manzo's 1999 conviction, *i.e.*, a certified copy of the judgment from the California Superior Court, he would have noticed that Mr. Veloz-Manzo pled guilty in 1999 to assault by means of force, not assault with a deadly weapon. *See id.* ¶ 24 & Att. B. Yet the government never submitted proper documentation. When the IJ asked the government's counsel if any documents were available, counsel stated that he did "not have the copies" of "any documents" relating to Mr. Veloz-Manzo's 1999 conviction. *Id.* ¶ 30. As a result, the IJ in Mr. Veloz-Manzo's removal proceeding relied solely on Mr. Veloz-Manzo's uncounseled and inaccurate concessions to determine the existence and character of his conviction, and to order him removed. *Id.* ¶ 32.[6]

Following his deportation on October 15, 2008, Mr. Veloz-Manzo soon returned to the United States. PSR ¶ 6. On December 6, 2008, he was accosted by a Napa County Police officer while filling his car at a gas station. *See id.* Although Mr. Veloz-Manzo was not engaged in any criminal–or even suspicious–activity, the officer approached Mr. Veloz-Manzo to determine if he was on probation or parole. *See id.* Mr. Veloz-Manzo did not tell the officer that he was under any sort of supervision. *See id.* Nevertheless, a subsequent record check revealed Mr. Veloz-Manzo's status and he was apprehended without further incident. *See id.*

On March 5, 2009, an indictment was returned against Mr. Veloz-Manzo charging him with illegal reentry after deportation in violation of 8 U.S.C. § 1326. PSR ¶ 1. By motion and supporting declaration filed July 20, 2009, Mr. Veloz-Manzo moved this Court to dismiss the

---

[6] The colloquy between the IJ and Mr. Veloz-Manzo appears in full in an order previously filed by this Court. *See* Memorandum & Order (Docket #24) (filed Oct. 2, 2009) at 2-4).

DEFENDANT'S SENTENCING MEMO          - 5 -

1  indictment on the grounds that his flawed deportation could not properly serve as a predicate for
2  the instant criminal prosecution. *See* Docket ##14 & 15 (filed July 20, 2009). The Court heard
3  argument on that motion on August 31, 2009, and issued an order respecting the motion on
4  October 2, 2009. *See* Memorandum & Order (Docket #24) (filed Oct. 2, 2009) [hereinafter
5  "Order"].

6  In that order, this Court found that the "mistaken charge infected the entirety of Mr. Veloz-
7  Manzo's removal proceedings and his immigration file." Order at 2:18-19. The colloquy
8  between the IJ and Mr. Veloz-Manzo, which was "pivotal to the proceedings," was also found to
9  "reflect[] the error." *Id.* at 2:25. Ultimately, based upon its interpretation of California state law,
10 this Court denied the motion to dismiss upon concluding that "the IJ would have reached the
11 exact same result–finding that Veloz-Manzo was removable–if the hearing had been conducted
12 error-free." *Id.* at 5:10-11. Nevertheless, the Court emphasized that the denial of the "motion
13 should not put the government at ease." *Id.* at 9:22. Specifically, this Court stated:

> Although Mr. Veloz-Manzo was not prejudiced by the serious errors in his proceedings, the nature of the errors is shocking and emblematic of the lack of protections provided to self-represented aliens in removal proceedings. What transpired at Veloz-Manzo's removal proceedings cannot be overstated: The IJ found that Veloz-Manzo, an individual who had been living in the United States for twenty years and who was recently married and expecting a child, was removable based on Veloz-Manzo's uncounseled admission to having been convicted of a crime that does not exist under California law and for which he quite obviously had never suffered a conviction.

19 *Id.* at 9-10. As such, "the procedures afforded to Veloz-Manzo plainly violated the spirit of the
20 constitutional provisions to protect his rights." *Id.* at 10:3-4. The Court directed the government
21 to serve this order on the Office of Chief Immigration Judge for distribution to all Immigration
22 and Judges and the Principal Legal Advisor of the United States Immigration and Customs
23 Enforcement for distribution to all ICE attorneys. *Id.* at 11:3-6.

24 Following the denial of his motion to dismiss the indictment, Mr. Veloz-Manzo entered an
25 open guilty plea to the sole charge in the indictment against, without any agreement with the
26 government. PSR ¶¶ 3-4. Mr. Veloz-Manzo went forward with this plea on account of his

DEFENDANT'S SENTENCING MEMO         - 6 -

extraordinary acceptance of responsibility for the offense, despite being advised that to do so, rather than proceeding to trial, would forfeit his right to appeal the denial of his motion to dismiss. Specifically, Mr. Veloz-Manzo "has indicated that he was motivated to return to United States by his desire to earn money to support and be with his family." PSR ¶ 11. Last year, Ms. Herrera gave birth to Mr. Veloz-Manzo's son, while Mr. Veloz-Manzo was in custody on the instant offense. PSR ¶ 38. Mr. Veloz-Manzo has seen his son on visiting day at the county jail, but on account of his custodial status has not been permitted to hold him. *Id.* In a letter to the Court attached to this memorandum, Ms. Herrera writes eloquently about how she has seen Mr. Veloz-Manzo "transform into a different person" than is suggested by his criminal record. *See* Attachment A (Letter). Similar observations about Mr. Veloz-Manzo are also presented in a letter from his mother attached to this memorandum. *See* Attachment B (Letter).

Mr. Veloz-Manzo "is hopeful that he may win an appeal on his deportation" in immigration court and be permitted to remain in this country. PSR ¶ 11. However, he is "aware that returning to the United States illegally could result in further punishment." *Id.* Mr. Veloz-Manzo has conclusively determined that he "does not want to continue on this same path." *Id.* Along these lines, Mr. Veloz-Manzo hopes "to start a program on the street to help juveniles stay out of gangs." PSR ¶ 45. Having disassociated himself from gangs, he wants to "challenge himself to have a 'normal routine,'" including a home with his wife and children, in Mexico if they cannot be together in the United States. PSR ¶ 11. These sentiments are further explained in a letter from directly Mr. Veloz-Manzo to the Court, attached to this memorandum. *See* Attachment C (Letter).

**ARGUMENT**

Freed from the requirement of mandatory sentencing guidelines, district courts are now guided in their sentencing discretion by the remaining statutory enactments of Congress. As a result of the Supreme Court's decision in *United States v. Booker,* 543 U.S. 220 (2005), the guidelines are now just one of many sources that courts must consult at sentencing. Instead, the

provisions of several statutes must be weighed and considered by courts to determine the minimum sentence necessary to achieve the purposes of sentencing. Together these statutes require a more balanced and individualized approach to determining a fair and just sentence than was previously permitted under the guidelines.

The Supreme Court in *Booker* directs sentencing courts to the remaining provisions of the Sentencing Act, particularly § 3553(a), for guidance in determining a "reasonable" sentence. *Booker,* 543 U.S. at 233-34. Section 3553(a) mandates that "[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2)." 18 U.S.C. § 3553(a); *see also* 18 U.S.C. § 3551(a) (providing that a defendant "shall be sentenced in accordance with the provisions of this chapter so as to achieve the purposes set forth in subparagraphs (A) through (D) of section 3553(a)(2) to the extent that they are applicable in light of all the circumstances of the case"). Those purposes are:

> the need for the sentence imposed -- (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

In addition to setting forth the purposes for courts to achieve at sentencing, § 3553(a) enumerates several other factors, in addition to the overall purposes of sentencing articulated in § 3553(a)(2), for courts to consider in exercising its sentencing discretion, only one of which is the now-advisory guidelines. Specifically, § 3553(a) provides that "[t]he court, in determining the particular sentence to be imposed, shall consider" the following: "the nature and circumstances of the offense and the history and characteristics of the defendant"; "the kinds of sentences available"; "the kinds of sentence and the sentencing range established" by the guidelines and "any pertinent policy statement" issued by the Sentencing Commission; "the need to avoid unwarranted sentence disparities among defendants with similar records who have been

DEFENDANT'S SENTENCING MEMO         - 8 -

found guilty of similar conduct"; and "the need to provide restitution to any victims of the offense." 18 U.S.C. § 3553(a)(1), (3)-(7).

Moreover, Congress has emphasized that, in considering these factors, sentencing courts are obligated to bear in mind that lengthy imprisonment may not be the best way to achieve the statutory goals of sentencing: "The court, in determining whether to impose a term of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in section 3553(a) to the extent that they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582(a). Thus, courts are required by statute to impose a reasonable sentence, taking into account all of the factors of 18 U.S.C. § 3553(a).

Here, the Presentence Report calculates the advisory guideline range to be 77 to 96 months, based upon Total Offense Level 21 and Criminal History VI. PSR ¶ 50. However, a sentence substantially lower than the advisory guideline range is warranted under the factors of § 3553(a), including extraordinary acceptance of responsibility and post-offense rehabilitation.

Mr. Veloz-Manzo has of course articulated his complete acceptance of responsibility for the charged offense with his statements during his interview with the U.S. Probation Officer and in his letter to the Court. But Mr. Veloz-Manzo's actions speak even louder than his words. Not only has Mr. Veloz-Manzo pleaded guilty without any consideration from the government, he has in doing so voluntarily forfeited the right to seek appellate review of the Court's denial of his motion to dismiss the indictment, despite finding that there were "shocking" errors in his deportation proceeding and that the procedures afforded to him "plainly violated the spirit of the constitutional provisions to protect his rights." Prior to this deportation in 2008, Mr. Veloz-Manzo had resided legally in the United States for nearly 20 years. A favorable determination on appeal would have precluded any criminal prosecution against him. Thus, Mr. Veloz-Manzo's actions no less than his words demonstrate an extraordinary degree of acceptance of responsibility.

DEFENDANT'S SENTENCING MEMO        - 9 -

In addition, the record conclusively demonstrates that Mr. Veloz-Manzo has made unusually admirable and sincere efforts toward rehabilitating himself. Despite a very difficult childhood in a gang-dominated environment with little adult guidance, Mr. Veloz-Manzo while in state custody made a decisive break with his past affiliations, at great risk to himself and his family. Already fluent in English, Mr. Veloz-Manzo took the opportunity to further his education and self-improvement as part of his commitment to a law-abiding lifestyle, including an interest in helping youths avoid involvement in gangs. Both Mr. Veloz-Manzo's wife, a college-educated juvenile hall counselor, as well as his mother, have remarked on his personal transformation.

Along these lines, Mr. Veloz-Manzo has not committed any new criminal offense since 2000, either while in prison or after his release, other than returning to this country. Unlike most defendants charged with illegal reentry, Mr. Veloz-Manzo was not encountered by the authorities as a result of some other misconduct. Rather, he was simply filling his car with gas at a filling station when a police officer with no reasonable suspicion accosted Mr. Veloz-Manzo, ultimately revealing his undocumented circumstances.

In recommending a sentence at the low-end of the guideline range, the U.S. Probation Office acknowledges these facts, but concludes "that the advisory guideline range provides adequate punishment, in that, Illegal Reentry Following Deportation and the defendant's prior convictions are serious, violent offenses." Sentencing Recommendation at 2. However, there are serious flaws with the Probation Officer's recommendation. As an initial matter, there is no authority for the odd claim that illegal reentry is a violent offense. More importantly, the explanation that the guideline range should be followed because it "provides adequate punishment" violates the express statutory requirement that the sentence imposed by the district court be "sufficient, but not greater than necessary." 18 U.S.C. § 3553(a).[7]

---

[7] The Recommendation also misleadingly states that Mr. Veloz-Manzo "has no history of verifiable employment." Sentencing Recommendation at 2. As noted above, Mr. Veloz-Manzo's undisputed claim of prior employment was corroborated by a 2000 Napa County Adult

DEFENDANT'S SENTENCING MEMO - 10 -

In this case, it cannot be disputed that a guideline sentence as recommended by the U.S. Probation Officer "provides adequate punishment." The problem is that the punishment provided by such a sentence is substantially more than is adequate or necessary. Rather, under the unusual circumstances presented by this case, a sentence of 30 months imprisonment constitutes punishment that is sufficient but not greater than necessary to achieve the statutory sentencing goals.

## CONCLUSION

For the aforementioned reasons, the Court should sentence Mr. Veloz-Manzo to 30 months imprisonment.

Dated: February 12, 2010

                                               Respectfully submitted,

                                               BARRY J. PORTMAN
                                               Federal Public Defender

                                               /s/

                                               DANIEL P. BLANK
                                               Assistant Federal Public Defender

---

Probation report. PSR ¶ 45. Moreover, as a procedural matter, since the government has not disputed Mr. Veloz-Manzo's claim of prior employment, that fact may be accepted as conclusively proven. Fed. R. Crim. P. 32(i)(3).

DEFENDANT'S SENTENCING MEMO  - 11 -